Affirmed and Memorandum Opinion filed January 22, 2008








Affirmed and Memorandum Opinion filed January 22, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-06-00959-CR

_______________

 

VIRGILIO REYES AGUILAR, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

                                                                                                  
                                             

On Appeal from the 185th District Court

Harris County, Texas

Trial Court Cause No. 1055002 

                                                                                                         
                                      

 

M E M O R A N D U M   O P I N I O N

Appellant
Virgilio Reyes Aguilar was convicted of sexual assault of a child and sentenced
to twenty-years confinement in the Texas Department of Criminal Justice,
Institutional Division.  In two issues, he challenges the legal and factual
sufficiency of the evidence to support his conviction.  Because we conclude the
evidence is legally and factually sufficient, we affirm.








I.  Factual and Procedural Background

On
January 24, 2006, appellant was indicted for the offense of sexual assault of a
child alleged to have occurred on or about July 15, 2004.  At his trial, which
began on October 24, 2006, the State presented testimony from the complainant (AC.C.@), her mother, the investigating
officer, and the physician who examined the complainant following her outcry
regarding the assault.

The complainant  C.C. was born May
19, 1998.  According to C.C.=s mother, C.C. and her family lived in a townhouse near
appellant from about August 2004 to August 2005.  While they lived there, C.C.
became friends with appellant=s step-daughter, AJ.L.@  The two girls frequently played
together in a large garden area in the center of the townhome complex.  C.C.=s mother testified that C.C. went
outside alone to play with her friends and also went to J.L.=s house to play.  According to C.C.=s mother, C.C. had suffered from a
brain lesion earlier in her life that affected her speech and education, but
C.C.=s physical development was normal. 
Her mother explained that C.C. could not read or write and had difficulty with
dates and times, but she did recognize some names and numbers.  C.C.=s mother testified that, during the
time that they lived near appellant, C.C. attended special education classes.[1] 
C.C. was dropped off by the school bus at about 2:30 in the afternoon, but C.C.=s father was always present when she
was dropped off.  








C.C.=s mother stated that C.C. made her
outcry at church after another girl disclosed abuse in an unrelated case.  The
police were called and began investigating the case.  According to C.C.=s mother, C.C. knew who had abused
her and cooperated with the investigation.  C.C. told both the investigating
officers and the hospital staff what had happened to her.  Her mother testified
that although C.C. did not understand the word Asex,@ she could describe what happened to
her.  She also stated C.C. had told her something was happening before she made
her outcry, but C.C. would not give any details because she did not want to
cause any problems with her father.  According to her mother, C.C.=s nickname was AChacha.@ 

Holly Ann Whillock, an officer in the
juvenile sex crimes unit at the Houston Police Department, testified next. 
According to Whillock, she had investigated many sexual assault cases.  She
stated that she met with C.C. and interviewed her with an interpreter present. 
Whillock described the interview as Adifficult,@ partly due to the complications of
working through an interpreter, and also because Ait wasn=t easy for [C.C.] to speak about@ what had happened.  According to
Whillock, C.C. had problems expressing what had happened to her, even though
she wanted to, because she had difficulty Aput[ting] words to the actions that
were taken against her.@  Whillock stated that C.C.=s statements were consistent with her
prior statements to the patrol officer who had interviewed her immediately
after she made her outcry.  Based on C.C.=s statements, police were able to
identify appellant as a suspect.  According to Whillock, C.C. identified
appellant through a photo array as the Aman who gave her money.@  After C.C. identified appellant,
Whillock attempted to contact him, but was unable to do so.  Another
investigator spoke with appellant; according to Whillock, appellant initially
denied knowing C.C., but later admitted he knew her as AChacha.@ On cross-examination, Whillock
acknowledged that no one from the police department had checked with appellant=s employer regarding his work
schedule and no one had attempted to discover whether anyone else had lived
with appellant when the assault occurred.  In response to questions by
appellant, Whillock  verified that C.C. did not identify appellant as the man
who assaulted her or who touched her improperly, but as Athe man that used to give [her]
money.@  Whillock also stated that C.C.
indicated during her interview that the assault occurred when she was eleven
years old.

Dr. Donna Mendez, the supervising
physician at Texas Children=s Hospital, testified regarding an examination she performed
on C.C. on September 14, 2005.  According to Dr. Mendez, the exam was normal. 
But she also stated, AThe majority of times, that=s C in 90 to 95 percent of the time, it=s a normal exam, even though there=s been admitted assault.@








C.C. testified next.  Although she
was eighteen at the time of trial, C.C. initially said she was fifteen when
asked her age; she later described herself as seventeen years old.  C.C.
referred to both her own and appellant=s sexual organs as Acolita.@  She indicated that appellant often
took her into his bedroom or his daughter=s bedroom.  Using anatomically
correct dolls, C.C. indicated that appellant put his penis in her vagina,
sucked her vaginal area, and bit her breasts.  C.C. verified that appellant Astuck his colita into her colita@; she also described how appellant
would get on top of her and Astruggle,@ which made her feel Abad.@  She testified that appellant wanted
her to suck his Acolita,@ but she refused.  She stated that appellant gave her money
so she would not tell anyone about what had happened; she also said he told her
he wanted to be her Aboyfriend@ and have a baby with her.  She testified that appellant was
the one who had assaulted her and described  an incident that had occurred in a
truck.  She also stated that the abuse occurred Aevery day.@  When asked about J.L.=s uncle on cross-examination, C.C.
stated that he was her Aboyfriend@ for about a year. She further acknowledged that she had met
with the prosecutor every day for two weeks prior to trial.  After she
testified, the State re-called her mother, who stated that C.C. had only met
with the prosecutor twice before trial.  The State then rested its
case-in-chief.

Appellant=s thirteen-year-old step-daughter,
J.L., testified for appellant.  J.L.  stated that appellant was her
step-father.  She also testified that her uncle had lived with her family in
July 2004.  J.L. indicated that during the 2004 and 2005 school years, she
arrived home from school at about 4:00 p.m. each day.  She explained that her
mother worked from 7:00 a.m. to 4:00 p.m. daily, and that appellant worked from
8:00 a.m. to about 5:00 or 6:00 p.m.  Her uncle had sometimes stayed at home
while everyone else was away.  According to J.L., C.C. did not play in her
house and never informed her about the abuse.[2]









Sergeant Mark Loera of the Houston
Police Department testified next.  He stated that he read appellant his rights
and took appellant=s statement.  According to Loera, appellant never asked for
an attorney nor refused to speak with him.  During cross-examination, Loera
indicated that when he showed appellant a photograph of C.C. and asked whether
appellant knew her, appellant initially stated he did not recognize her. 
Later, when Loera told appellant that C.C. had visited his step-daughter,
appellant admitted knowing her as AChacha,@ but denied assaulting her.

According to Quang Tu Ho, appellant=s employer at the time of the
assault, appellant worked for his seafood wholesale company.  Ho explained that
appellant=s normal work hours were from 9:00 a.m. to 5:00 or 6:00 p.m.  Ho also
brought appellant=s work records for the relevant time period and they were
admitted into evidence.  Ho stated that appellant completed his own time
sheets, and that appellant=s job involved driving a seafood delivery truck.  According
to Ho, appellant was typically out of the office all day delivering seafood,
with no one else with him.  After Ho testified, the defense rested.

The jury found appellant guilty as
charged and assessed punishment at 20 years confinement in the Texas Department
of Criminal Justice, Institutional Division.  This appeal timely followed.

II.  Issues
Presented for Review

In two issues, appellant challenges
the legal and factual sufficiency of the evidence supporting his conviction. 
Specifically, he focuses on the lack of physical evidence, the alleged Aunavailability@ of the complainant to appellant, the
lack of proof that an offense occurred on or about the alleged date, and the
lack of evidence of penetration.

III.  Sufficiency of the Evidence

A.        Legal
Sufficiency








When reviewing the legal sufficiency
of the evidence, we do not ask whether we believe the evidence at trial
established guilt beyond a reasonable doubt.  Jackson v. Virginia, 443
U.S. 307, 318‑19, 99 S.Ct. 2781, 2789 (1979).  Rather, we examine all the
evidence in the light most favorable to the verdict to determine whether any
rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt.  Id. at 319, 99 S.Ct. at 2789; Mason v.
State, 905 S.W.2d 570, 574 (Tex. Crim. App. 1995) (en banc).  Our review of
the evidence includes both properly and improperly admitted evidence.  Clayton
v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  We consider both
direct and circumstantial evidence, and all reasonable inferences that may be
drawn therefrom in making our determination.  Id.

The indictment in this case alleged
appellant Aintentionally and knowingly cause[d] the penetration of the FEMALE SEXUAL
ORGAN of [C.C.] . . . , a person younger than seventeen years of age and not
his spouse, by placing HIS SEXUAL ORGAN in the FEMALE SEXUAL ORGAN of the Complainant.@  See Tex. Penal Code Ann. ' 22.011(a)(2)(A) (Vernon 2003).  The
testimony of a sexual assault victim alone is sufficient to warrant a
conviction.  See Tex. Code Crim. Proc.
Ann. art. 38.07 (Vernon 2005) (stating that a conviction under section
22.011 of the Penal Code is supportable on the uncorroborated testimony of the
victim of the sexual assault without corroboration if the victim was younger
than seventeen years old at the time of the alleged offense); Sandoval v.
State, 52 S.W.3d 851, 854 n.1 (Tex. App.CHouston [1st Dist.] 2001, pet. ref=d).  

As discussed above, much of C.C.=s testimony came through her
demonstrative use of anatomically correct dolls.[3] 
She referred to both her own and appellant=s sexual organs as Acolita.@[4]  She specifically stated that
appellant placed his Acolita@ in her Acolita@:

[C.C.]: He asked me to open my legs all the way.

[the State]: Can we let the record reflect she=s opened the legs of the female doll?

[the State]: And when he did that, did he stick his
colita into your colita?








[C.C.]: (Nods head affirmatively.)

[the State]: Can you answer out[loud]?

[C.C.]: Yes.

. . .

[the State]: [C.C.], before [appellant] put his colita
in your colita, did you see him do anything with his colita?

[C.C.]: He put it in hard.  I asked him,
No more. [sic]

This testimony alone is legally
sufficient to establish appellant sexually assaulted C.C.  See Tex. Code Crim. Proc. Ann. art. 38.07; 
Sandoval, 52 S.W.3d at 854 n.1.

Appellant, however, contends that the
evidence is insufficient to prove that appellant assaulted C.C. during the
brief time period while she was living in close proximity to appellant before
she turned seventeen on May 9, 2005.  Although the indictment alleges the
sexual assault occurred on or about July 15, 2004, the Aon or about@ language permits the State to prove
a date other than the one alleged in the indictment, so long as that date is
anterior to presentment of the indictment and within the statutory limitation
period.  Sledge v. State, 953 S.W.2d 253,  255B56 (Tex. Crim. App. 1997) (en banc). 
Although C.C. had difficulty understanding and relating dates and times, she
testified that appellant assaulted her during the school year after she got
home from school; she stated that appellant took her into Athe room@ while appellant=s daughter was at school.  She also
testified that appellant sexually abused her Aevery day.@  Her mother stated that the family
moved to the town home near appellant in August 2004.  Viewing this evidence in
the light most favorable to the verdict, we conclude that a rational trier of
fact could have found that appellant sexually assaulted C.C. between August
2004 and her seventeenth birthday on May 9, 2005.  We therefore overrule
appellant=s first issue.

B.        Factual
Sufficiency








When reviewing the factual
sufficiency of the evidence, we view all the evidence in a neutral light and
set aside the verdict Aonly if it is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust.@  Cain v. State, 958 S.W.2d
404, 407 (Tex.Crim.App.1997) (en banc) (quoting Clewis v. State, 922
S.W.2d 126, 129 (Tex.Crim.App.1996) (en banc)).  Before we may reverse for
factual insufficiency, we must first be able to say, with some objective basis
in the record, that the great weight and preponderance of the evidence
contradicts the jury=s verdict.  Watson v. State, 204 S.W.3d 404, 417 (Tex.
Crim. App. 2006).  When reviewing the evidence, we must avoid intruding on the
factfinder=s role as the sole judge of the weight and credibility of the witness
testimony.  Johnson v. State, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000) (en
banc). We do not re‑evaluate the credibility of witnesses or the weight
of evidence, and we will not substitute our judgment for that of the
factfinder.  Johnson v. State, 967 S.W.2d 410, 412 (Tex. Crim. App.
1998).  Finally, we must discuss the most important and relevant evidence that
supports the appellant=s argument on appeal.  Sims v. State, 99 S.W.3d 600,
603 (Tex. Crim. App. 2003).  

Appellant points to several
inconsistencies in C.C.=s testimony and her apparent confusion; C.C.=s developmental issues are quite
evident in the record.  For example, C.C. had variously described the person
who assaulted her in prior statements and some of these descriptions did not
match appellant=s appearance.  Although she had difficulty describing her
assailant in the abstract, however, she repeatedly identified her assailant as
J.L.=s father and denied that anyone else
assaulted her when pressed by appellant on cross-examination.  Moreover, she
was clearly confused regarding dates and times, stating that she had met with
the prosecutor in this case every day for two weeks when her mother testified
that she had only met with the prosecutor twice before trial. 








The jury was informed of C.C.=s developmental disabilities through
both testimony and voluminous school records entered into evidence.  In fact,
according to her school records, C.C. had an IQ of only 52, which was
designated a Avery poor@ classification.  The jury no doubt took these facts into
consideration in weighing the credibility of her testimony.  See Westbrook
v. State, 29 S.W.3d 103, 112 (Tex. Crim. App. 2000) (en banc) (emphasizing
the jury=s role as the sole judge of the
weight and credibility of witness testimony).  Indeed, the jury may choose to
believe or disbelieve any portion of a witness=s testimony.  Rojas v. State,
171 S.W.3d 442, 446 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d).  We presume the jury resolved any
conflicting evidence in favor of the prevailing party.  Id.

Appellant also relies on the
testimony of his employer, Quang Tu Ho, and the copies of his employment
records submitted into evidence to support his contention that he did not have
access to C.C. during the time period alleged because he worked full-time. 
But, as noted above, Ho indicated that appellant drove a seafood delivery truck
for Ho=s seafood wholesale company.  Appellant
was therefore out of the office delivering seafood, with no one to verify where
he was between deliveries.  Thus, appellant=s evidence does not establish that he
could not have sexually assaulted C.C.  And appellant=s claim that Ano one@ testified that they saw him alone
with C.C. during the relevant times ignores C.C.=s testimony that appellant sexually
assaulted her when no one else was present.  

Viewing all the evidence in a neutral
light, we cannot say that the jury=s verdict is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.   We
therefore overrule appellant=s second issue.

IV.  Conclusion

Having overruled appellant=s legal and factual sufficiency
challenges, we affirm the judgment of the trial court.

 

 

 

 /s/       Eva M. Guzman

Justice

 

Judgment rendered and Memorandum
Opinion filed January 22, 2008.

Panel consists of Justices Yates,
Fowler, and Guzman.

Do Not Publish C Tex.
R. App. P. 47.2(b).









[1]  C.C.=s educational
records were admitted into evidence.  According to these records, C.C. suffered
from both mental retardation and speech impairment.





[2]  A fourteen-year-old friend of C.C. and J.L. also
stated that she did not recall ever seeing C.C. in appellant=s house.





[3]  Much of C.C.=s
testimony is difficult to understand and appears inconsistent.  For example,
she often did not answer the question asked, and she seemed confused about
seemingly simple concepts, such as her own age.  The record, however, also
reflects that C.C. suffered from developmental delays and difficulty with
language and concepts such as dates and time. 





[4]  For example, the prosecutor asked C.C. what she
called the male sexual organ by indicating it on the anatomically correct
doll.  C.C. replied, AColita.@ 
The prosecutor indicated for the record that C.C. was referring to the penis of
the male doll.  Later, when C.C. was asked where on her body appellant put his
mouth, she indicated, using the dolls, that appellant put his face in her
vaginal area.